**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-2310**

───────────────

LAVERNE MCIVER,

        Plaintiff - Appellant,

    v.

BRIDGESTONE AMERICAS, INC.; BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC; BRIDGESTONE RETAIL OPERATIONS, LLC,

        Defendants – Appellees,

    and

BRIDGESTONE, LLC,

        Defendant.

───────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Malcolm J. Howard, Senior District Judge.  (5:19-cv-00038-H)

───────────────

Argued:  December 8, 2021                       Decided:  August 2, 2022

───────────────

Before NIEMEYER, MOTZ, and RICHARDSON, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge
Niemeyer joined.  Judge Motz wrote a separate opinion, concurring in the judgment.

───────────────

**ARGUED:** Mark Lowell Hayes, LAW OFFICE OF MARK L. HAYES, Durham, North Carolina, for Appellant. Nicholas Alex Sarokhanian, HOLLAND & KNIGHT, LLP, Dallas, Texas, for Appellees. **ON BRIEF:** Mary Goodrich Nix, HOLLAND & KNIGHT LLP, Dallas, Texas, for Appellees.

_____

2

RICHARDSON, Circuit Judge:

Laverne McIver claims that Bridgestone Americas Tire Operations discriminated against her based on her race by allowing a hostile work environment to pervade its manufacturing plant and by retaliating against her for accusing a co-worker of tampering with her machine. Bridgestone moved for summary judgment, and the district court granted summary judgment in Bridgestone's favor on all claims. McIver now appeals the district court's order, and we affirm.

## I.    Background

Since 1996, Laverne McIver, a Black female, has worked for Bridgestone Americas Tire Operations in Wilson, North Carolina. Bridgestone manufactures tires, and at first McIver worked in the VMI department.[1] There, McIver worked with Chris Hawley, a White male. According to McIver, they were "friends" and "worked side-by-side" at VMI. J.A. 185.

Hawley later transferred to Bridgestone's MTS department. After Hawley's transfer, McIver heard that Hawley was "not the same as he was in VMI," but she "blew it off because [they] got along great at VMI." J.A. 185. But that changed around 2006 when a noose was found on the machine of two Black employees in the MTS department. McIver did not see the noose personally but saw a picture of it. And, according to McIver, Hawley later told her that he made the noose. Hawley also bragged in the presence of other employees that he hung the noose as well. According to McIver, a different employee,

---

[1] Both parties refer to Bridgestone's various departments by the name of the machine used in that department—VMI, MTS and KBN2.

3

Jason Wheeler, took the blame for the noose so that Hawley would not lose his job. And McIver claims that Wheeler was not disciplined, even after taking the blame, because his uncle managed the Bridgestone plant.

Even so, McIver requested a transfer to MTS within a year of these events (2007). Bridgestone granted her request, and she became the only Black employee in her crew (which is the term Bridgestone uses for shifts) within MTS. Hawley still worked in MTS, on the same crew. After starting there, McIver overheard Hawley say that "[w]e were doing fine without black people on this crew." J.A. 184. After other Black workers joined this crew a year or so later, McIver heard Hawley say that "[McIver] is the reason why black people got to come to this crew." J.A. 185. In 2008, McIver alleged that one of her co-workers, John Ezzell, caused the machine she worked on to malfunction.[2] Ezzell then left Bridgestone in 2009. McIver filed an EEOC charge related to discrimination in 2009, though it is unclear if this was before or after Ezzell left.

Between 2009 and 2013 McIver did not personally experience any more racial animus, but other racial incidents occurred at Bridgestone during that time that were not directed at her. In either 2012 or 2013, two racist caricatures of Trayvon Martin were

---

[2] McIver argued below that "[s]he began being harassed by her co-workers following her second [EEOC] charge" in 2014. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 2, *McIver v. Bridgestone*, *LLC*, No. 5:19-CV-00038-H, ECF No. 46 (E.D.N.C. Feb. 29, 2020). She also claimed below that she "hadn't accused any of her co-workers of tampering with her machine until the 2013 complaint." *Id.* at 13. We assume without deciding that McIver's statements below do not amount to a judicial admission, *see Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226–27 (9th Cir. 1988), and that her new theory on appeal was not forfeited below, *see Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 351 (4th Cir. 2020), because this lone accusation of tampering against an employee who left the company long before McIver sued does not change the outcome here.

4

drawn in Bridgestone bathrooms. The first drawing appeared in the men's bathroom of the MTS department. After someone told McIver about the drawing, she viewed the drawing by standing outside the bathroom. Above the drawing someone wrote, "TRAYVON OBAMA." J.A. 243. After the drawing was reported, Bridgestone removed it from the wall. But McIver alleges that Bridgestone never acted to identify the person responsible, and "nothing" happened. J.A. 198.

The second drawing of Trayvon Martin was drawn with an "X" for each eye and included a confederate flag and the words "JUSTICE SERVED!" J.A. 244. This drawing was done in the bathroom of another department, not MTS. McIver did not personally see this drawing, but someone showed her a picture of it. Bridgestone also removed the second drawing but once again failed to catch the person responsible.

It appears the drawings weren't the worst of it. Two monkeys made of tire tubing were found hanging from machines in Bridgestone's tubing department. The exact date of these incidents is unclear, but both occurred while McIver was working in MTS and "much earlier" than 2018. J.A. 201–02, 222. One monkey had bulging eyes and a noose around its neck. McIver did not see this monkey but at some point received a picture of it and news of the monkey was "going around the plant at that time." J.A. 202. McIver says that Bridgestone investigated the monkey with bulging eyes but could not find the culprit. The other monkey had no eyes. McIver learned about that monkey from a co-worker and went to the tubing department to see it for herself. After going to see this monkey, McIver expressed dismay that Bridgestone claimed to be unable to catch the person responsible because the area had surveillance cameras all over the place.

5

In 2013, McIver filed a complaint using Bridgestone's company complaint line alleging that someone was tampering with and sabotaging the MTS machine she worked on.[3]  She believed that someone was changing the settings on her machine overnight to make them incorrect.

Kimberly Barnes worked with McIver in MTS from 2007 to 2016 and says she "reported the harassment of [McIver] . . . many times but management wouldn't do anything about it."  J.A. 93.  According to Barnes the "vast majority of employees that harassed [McIver] were white males" and Barnes described them as "racist" because she "heard some of these employees make racist comments."  J.A. 93–94.  Barnes says the MTS employees "teamed up together to try and have [McIver] removed from the department."  J.A. 93.  According to Barnes, their plan involved telling "the supervisor to start reviewing and noting [McIver's] inability to work well with others."  J.A. 93.

And McIver did receive negative evaluations from supervisors.  In 2016, McIver's performance review reflected that her "[b]ehavior" was "below expectations" because "[t]here has been issues with other teammates working with Laverne," but Bridgestone agreed to revise it to "meets expectations" after she filed an internal complaint about it. J.A. 57, 258.  While pursuing internal complaints about her performance review, McIver

---

[3] McIver's own statements are ambiguous about whether she also filed an EEOC complaint about her 2013 tampering accusations.  The EEOC charge is not in the record, but McIver's deposition testimony suggests that she filed an EEOC charge, which "might've been race discrimination" in 2013 based on tampering and Bridgestone's subsequent inadequate investigation.  J.A. 135.  But McIver's complaint states that after her 2009 EEOC charge she did not file a second EEOC charge until February 5, 2014. Because these factual discrepancies in McIver's allegations do not affect our analysis, we need not resolve them.

met with Michael Darr, her plant manager. Darr told McIver that she needed to "apologize to the boys." J.A. 181. Darr did not specify who he meant by "the boys," and he refused to clarify who he meant or what McIver did that required an apology. But McIver assumed that "the boys" meant Hawley and Wheeler because they "were the only two boys [she] was having a problem with at that time" after she "mention[ed] their names because of the noose rope." J.A. 229.

Consistent with both her theory and Bridgestone's, McIver's 2017 performance review again cited concerns about her teamwork, specifically that "bringing up concerns about sabotage of her machine by other MTS operators that can't be corroborated negatively impacts teamwork and morale." J.A. 46. Like her claims from 2013, McIver claimed the settings on her machine were often incorrect at the beginning of her shift, and she accused the workers on the prior shift of configuring the settings incorrectly to mess her up. Other employees in MTS complained to Bridgestone that they "need[ed] to walk on eggshells around her" because she was often "levying accusations against them and claiming there was a conspiracy against her." J.A. 42. After complaining to management about her 2017 performance review, Andy Moler, Bridgestone's Human Resources Manager, asked McIver to "to go back to where all this got started." J.A. 227. In doing so, she recounted Hawley hanging the noose back in 2006, suggesting she viewed the tampering as an extension of those earlier, racially charged events.

In 2018, on three occasions McIver found grease on the buffer arm of her machine—where grease was not supposed to be because it was a sensor. She told Eddie Barnes, an MTS trainer and specialist, about the grease, and Barnes responded that "somebody had to

7

keep putting it there." J.A. 156. McIver responded "I don't know, Eddie. I didn't see it." J.A. 156. She said she was not accusing anybody of tampering and a "maintenance man" noted that somebody with grease on their hands from working on other parts of the machine may have touched the buffer arm. J.A. 156.

McIver also made a second tampering allegation in 2018 after discovering that the sidewall drum on the MTS machine she operated was "too big." J.A. 158–60. At the time McIver's building partner was Mahlon "Troy" Skelton,[4] and she told her co-workers that she "saw Troy over in that area." J.A. 162. But when asked whether she believed her MTS coworker intentionally changed the drum size, McIver said, "I don't know." J.A. 161. Bridgestone concluded there was "no evidence" of "sabotage" by Skelton, but there are no details available of its investigation. J.A. 46.

Bridgestone's internal data may provide some support for the idea that McIver's machines were tampered with. Bridgestone kept extensive data on the MTS operators, including data about delays while setting up to begin work. That data reveals that McIver had substantially more set-up delays than other MTS operators. During August 2017 to April 2018, McIver's set-up delays were "double that of any other operator," J.A. 46, which Bridgestone attributed to her "decision making skills related to machine operation." J.A. 246.

Bridgestone believed that McIver falsely accused Skelton of enlarging the sidewall drum on her machine and decided that McIver's teamwork and performance issues required

---

[4] At times McIver also refers to this same person as Troy Malhon. Skelton began working at Bridgestone in May 2016.

8

corrective action.  Bridgestone management and HR personnel met with McIver in April 2018 to deliver Phase 1 coaching.  Phase 1 coaching is the lowest level of corrective action at Bridgestone and only serves to identify areas of improvement, so an employee in Phase 1 coaching is not subject to any punishment.

During the Phase 1 coaching meeting, McIver claimed that Bridgestone paired her with Skelton on the MTS machine to set her up for failure, and she raised her voice and yelled at Bridgestone management.  McIver claims she only raised her voice one time and after she was told to "calm down" there "was no problem."  J.A. 163.  Yet other Bridgestone employees described her as "very loud, almost irate," and said she "wouldn't let anybody talk," J.A. 75, and "was antagonistic and belligerent," J.A. 43, 74–75, 302.  At the end of the meeting, she refused to sign a document acknowledging the Phase I corrective action.

Bridgestone was concerned about McIver's conduct during the Phase 1 coaching meeting and did not feel comfortable allowing her to return to MTS.  Management decided to suspend her—with pay—for several days while it determined the best response.  Bridgestone believed McIver's teamwork issues would be resolved if she worked on a one-person machine, so seven days after suspending her, Bridgestone gave her two options: transfer to the KBN2 department, where she would not need to work with a teammate or resign and receive three months' severance pay.

McIver accepted the transfer to KBN2 in April 2018.  Although the transfer to KBN2 was a lateral transfer with the same base salary, Bridgestone policy required all transfers to a new department to wait three months before working voluntary overtime.  In

9

October 2018, McIver filed an EEOC complaint related to her transfer to KBN2.  And the EEOC dismissed that complaint and granted her a right to sue letter.

McIver then sued Bridgestone in federal district court.[5]  She alleged that her transfer to KBN2 stemmed from intentional discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e, *et seq.*  The district court granted summary judgment to Bridgestone on all claims, and McIver now appeals.[6]

---

[5] McIver sued Bridgestone Americas Tire Operations, LLC; Bridgestone, LLC; Bridgestone Americas, Inc.; and Bridgestone Retail Operations, LLC.  The district court dismissed the claims against all defendants except for Bridgestone Americas Tire Operations, LLC because it is the only entity that has ever employed McIver.  McIver does not challenge this aspect of the district court's judgment.

[6] We lack jurisdiction to review a district court's order unless it is a "final" judgment, 28 U.S.C. § 1291, which means that the order "has resolved all claims as to all parties." *Fox v. Balt. City Police Dep't*, 201 F.3d 526, 530 (4th Cir. 2000).  To answer that question "we look to substance, not form" and so the label attached to the district court's order is not dispositive.  *Porter v. Zook*, 803 F.3d 694, 696 (4th Cir. 2015).  And though the parties have not questioned our jurisdiction, we have an independent obligation to ensure that we have appellate jurisdiction, and we do so here.  *See id.*

In her complaint McIver lists three causes of action:  (1) race discrimination in violation of Title VII, (2) retaliation in violation of Title VII, and (3) hostile work environment in violation of Title VII.  Yet in passing, and without elaboration or supporting facts, McIver's complaint also summarily says that "this is an action for wrongful termination in violation of public policy violation of [sic] N.C. Gen. Stat. § 143-422.2." J.A. 10.  Bridgestone contested this allegation in its Answer, responding that "Defendants deny that Plaintiff has asserted a cause of action under N.C. Gen. Stat. § 143-422."  J.A. 22.

Bridgestone later moved for summary judgment on "all of Plaintiff's claims," Def.'s Mot. for Summ. J. 1, *McIver v. Bridgestone, LLC*, No. 5:19-CV-00038-H, ECF No. 35 (E.D.N.C. Jan. 30, 2020), arguing that McIver "failed to include a count for relief under [North Carolina law], nor did she allege any facts supporting such a claim," Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 2 n.2, *McIver*, No. 5:19-CV-00038-H, , ECF No. 36 (E.D.N.C. Jan. 30, 2020).   In response, McIver appears to have agreed to this (Continued)

10

## II.    Discussion

On appeal, McIver only challenges the district court's grant of summary judgment against her hostile-work-environment and retaliation claims.[7] She argues that the district court wrongly concluded that her hostile-work-environment claim was not supported by evidence of race-based harassment that was severe or pervasive enough. She also argues that her retaliation claim was based on a reasonable belief that the tampering to her machine was due to her race and that her transfer to KBN2 was causally related to her complaints. All these arguments largely fail for the same reason: McIver presents no evidence that would allow a jury to conclude that any tampering that occurred in 2018 was based on her race.

---

understanding, describing her suit as "for discrimination on the basis of race and retaliation" but only citing federal law. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. 1, *McIver*, No. 5:19-CV-00038-H, , ECF No. 46 (E.D.N.C. Feb. 29, 2020). The district court's order granted Bridgestone's motion for summary judgment as to all claims, explaining its rationale for granting summary judgment against the Title VII claims but failing to address the existence of any claim under N.C. Gen. Stat. § 143-422.2. The district court further directed the clerk "to close this case." J.A. 323.

We conclude that this lawsuit contains no claim under North Carolina law. McIver's complaint never asserts that she is "entitled to relief" under § 143-422.2. Fed. R. Civ. P. 8(a)(2). Her characterization of her lawsuit in her summary judgment response implicitly concedes as much. Because no such claim existed, the district court was not required to resolve it before closing the case. So the order is final, and we have jurisdiction. *See* 28 U.S.C. § 1291.

[7] We review summary judgment de novo, viewing the facts and inferences in the light most favorable to the nonmoving party. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). Granting summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the nonmoving party must set forth evidence that would allow a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

11

A.     **Hostile Work Environment**

When racial animus in the workplace creates a hostile work environment, requiring an affected employee to work in it amounts to intentional racial discrimination by the employer and is actionable under Title VII. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (en banc) (citing 42 U.S.C. § 2000e-2(a)(1)). To succeed on a hostile-work-environment claim "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id.* at 277 (alteration in original) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). A hostile-work-environment claim will only succeed when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Unlike a typical claim of intentional discrimination based on a discrete act, a hostile-work-environment claim's "very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

The severe or pervasive conduct which gives rise to an abusive work environment must be both objectively and subjectively "hostile" and "abusive." *Harris*, 510 U.S. at 21–22 (requiring the plaintiff to prove "the environment would reasonably be perceived, and

12

is perceived, as hostile or abusive").[8]  Objective analysis of whether a workplace is hostile and abusive looks to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Boyer-Liberto*, 786 F.3d at 277.  But the ultimate inquiry is whether the conduct is so "extreme" that it "amount[s] to a change in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Even conduct that would objectively cause hurt feelings or offense is not enough to be severe or pervasive.  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).

The inquiry into objectively severe or pervasive abusive conduct must focus on the events that the plaintiff personally experienced.  *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004).  "[E]xperiences of third parties about which the plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement."  *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019).  But conduct directed at others is relevant if the plaintiff knew of the conduct.  *Sunbelt Rentals*, 521 F.3d at 317.  The status of the harasser is also a "significant factor" to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious.  *Boyer-Liberto*, 786 F.3d at 278.  After all, "a supervisor's power

---

[8] However, the plaintiff need not establish a psychological injury.  "Title VII comes into play before the harassing conduct leads to a nervous breakdown."  *Harris*, 510 U.S. at 22.

and authority invests his or her harassing conduct with a particular threatening character."
*Id.* (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 763 (1998)).

Often the relevant conduct "occurs over a series of days or perhaps years" and "a single act of harassment may not be actionable on its own" because "[s]uch claims are based on the cumulative effect of individual acts." *Morgan*, 536 U.S. at 115. That "series of separate acts . . . collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* Yet large temporal gaps between allegations undermine a hostile-work-environment claim. When allegations "are remote in time relative to each other" and to the adverse employment action, the "evidence does not create a genuine issue of material fact" that the conduct is pervasive enough. *Perkins*, 936 F.3d at 210; *see also Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir. 1996) (noting that a few sexually discriminatory incidents that "occurred intermittently over a seven-year period, with gaps between incidents as great as a year [and] [t]hat alone suggests the absence of a condition sufficiently pervasive to establish Title VII liability"), *abrogated on other grounds by Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1742 (2020). Large temporal gaps suggest occasional problems, not pervasive ones.

In this appeal, the parties only dispute whether McIver has provided sufficient evidence that any tampering to her machine was based on race, and whether her allegations, taken together, are severe or pervasive enough to rise to the level of a hostile work environment. The varied conduct alleged by McIver, spanning twelve years, can be

14

grouped into three categories: (1) tampering that McIver attributes to racial animus, (2) abhorrent and explicitly racial harassment that was not directed at McIver, but which she knew about, and (3) comments of racial animus made directly to her ten years or more before her claim was filed. *See Perkins*, 936 F.3d at 211 ("[W]e are mindful that we have primarily discussed the evidence offered by Perkins in categories. In so doing, we do not overlook the requirement that we consider the totality of the plaintiff's experiences in evaluating whether an environment is severe or pervasive."). Yet one common thread runs through the allegations—McIver does not allege that her supervisors perpetrated any of the conduct at issue. *See Boyer-Liberto*, 786 F.3d at 278.

We begin with McIver's tampering allegations, which are what led to her transfer to KBN2 and this suit. McIver's tampering accusations do not support her hostile-work-environment claim because McIver fails to put forward evidence that any tampering, if it occurred, was based on her race. Unlike obviously racist comments or imagery, tampering is not inherently race based—and therefore cannot contribute to McIver's hostile-work-environment claim unless her evidence creates a genuine dispute of material fact that the tampering was race based. "To establish that harassment was based on race, [the plaintiff] must show that but for her race, she would not have been the victim of the alleged discrimination." *Gilliam v. S.C. Dep't of Juv. Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (cleaned up). We may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race. *See Sunbelt Rentals*, 521 F.3d at 318. But a plaintiff cannot rely

15

on her own "conjecture" to impute a racial character to what appears to be neutral harassment. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280–81 (4th Cir. 2000).

McIver's 2008 tampering allegation identified Ezzell as the culprit, and McIver makes no accusation, nor presents any evidence, that she suffered from tampering disproportionately or that Ezzell had racial motivations. And Ezzell left Bridgestone the next year, so his actions long ago and in relative isolation cannot create a pervasively hostile work environment over the entire relevant period. We also have very little detail on this record of any tampering that occurred between 2008 and 2016. McIver names no culprit for any alleged tampering during this time, and the thin description of the accusations leaves no basis for inferring racial animus. Additionally, although Kimberly Barnes stated that the men in the MTS department were "racist," she never accused them of tampering with McIver's machine.

Then in 2017, McIver accused those on the shift before hers of intentionally altering the settings on her machine. At the time, McIver was on A-Crew and she accused the crew before hers—B-Crew—of tampering. McIver's allegations do not identify the individuals on B-crew that she thought were responsible or offer any evidence of racially discriminatory conduct by individuals on B-crew. The only two individuals that McIver has specifically accused of discriminatory conduct are Hawley and Wheeler, and they both served on A-crew with McIver. So even if such tampering occurred, there is simply no basis in the record from which a jury could infer it was due to racial animus. *See Sunbelt Rentals*, 521 F.3d at 318.

16

That leaves McIver's two tampering accusations in 2018—when she found unexplained grease on the buffer arm of her machine and when the sidewall drum on her MTS machine was too big. But she also fails to put forward sufficient evidence that either of these events were race based. Nothing in the record suggests that either Hawley or Wheeler was responsible for these events or even had the opportunity to commit them. Further, McIver now insists that she was not accusing any particular person of tampering with her machine, but at the time, Skelton was the only person that she suggested was "over in that area." J.A. 162. And McIver does not allege that Skelton discriminated against her based on race and testified in her deposition that she could not recall Skelton saying or doing anything racially derogatory to her. Thus, none of McIver's tampering accusations are in any way tied to racial animus and therefore deserve no weight in the hostile-workplace analysis.

Next we move on to the episodes of egregious racial harassment that were not directed at McIver. In 2006, Hawley hung a noose on the machine of two Black MTS employees. McIver did not work in MTS at the time, but she saw a picture of the noose and moved into the MTS department the next year. About six years later the caricature drawings appeared in the men's bathrooms—one drawing in MTS and the other somewhere else at Bridgestone. McIver saw the drawing in MTS herself, and she saw a picture of the other drawing. Last, two monkeys made of tire tubing were found hanging from a noose in Bridgestone's tubing department. McIver did not work in the tubing department, but she saw one of the monkeys and saw a picture of the other. But there is

17

no evidence of when these monkeys were found hanging.  We only know that the events occurred while McIver was in MTS and "much earlier" than 2018.

The use of a noose to intimidate a Black person is a despicable and heinous act. And as this Court recognized, "describing an African-American as a monkey . . . goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." *Boyer-Liberto*, 786 F.3d at 280 (cleaned up).  But the question here is whether these events give rise to legal liability, not just whether they are reprehensible.  Unlike the harassment in *Boyer-Liberto*, none of this racial harassment targeted McIver, none of the acts are attributed to a supervisor, and, other than the caricature drawn in the MTS restroom, the conduct occurred in other Bridgestone departments.

Over ten years before McIver filed her complaint, she also experienced racial animus by Hawley that personally targeted her.  Hawley told McIver about his responsibility for the noose, and he also said in the presence of McIver and others that "[w]e were doing fine without black people on this crew," J.A. 184, and that other Black people managed to join his crew at MTS because of her.  That said, Hawley is not McIver's supervisor, and he has no degree of control over her, which gives these comments less weight in the hostile-workplace analysis.  *See Boyer-Liberto*, 786 F.3d at 278.

Additionally, all of the explicitly racial conduct alleged by McIver, both directed at her and not, all occurred long ago and intermittently over seven years.  Moreover, the most recent instance of racial animus at Bridgestone occurred more than five years before she filed this claim.  So these allegations are simply "too remote to be pervasive, and, thus, insufficient to create a genuine issue of material fact." *Perkins*, 936 F.3d at 210.

18

The totality of these allegations, and the evidence put forward to support them, fails to create a genuine question of material fact that racial discrimination in Bridgestone's MTS department was so severe or pervasive that it constituted a hostile work environment. *See Faragher*, 524 U.S. at 788. McIver fails to connect her tampering allegations to circumstances that imply racial animus, and her other allegations of racial harassment at Bridgestone, which are no doubt reprehensible, were not committed by supervisors and are too remote in time to support this claim.

## B.  Retaliation

McIver also alleges that Bridgestone unlawfully retaliated against her by transferring her to KBN2 in response to her accusations of tampering. Title VII "prohibits an employer from retaliating against a worker for either participating in a Title VII proceeding or opposing an employer's discriminatory practices." *Perkins*, 936 F.3d at 213.[9] "To establish a prima facie claim of retaliation, a plaintiff must show: (1) that he engaged in protected activity, (2) that the employer took a materially adverse action against him and (3) there is a causal connection between the protected activity and the adverse action." *Id.* At issue here is whether McIver engaged in a protected activity when her 2018 tampering accusations led to her reassignment from MTS to KBN2. We hold that, because

---

[9] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or . . . made a charge" under Title VII. 42 U.S.C. § 2000e-3(a).

19

McIver's complaints about tampering were not linked to any racial motivation, they were not protected activities under Title VII, and thus cannot support a claim of retaliation.[10]

Protected activities under Title VII include both participation and opposition activities. *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 257 (4th Cir. 1998). Opposition activities include "staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* at 259. But only when an employee has "an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress" is the employee's conduct "protected." *Boyer-Liberto*, 786 F.3d at 282 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 340–41 (4th Cir. 2006) (noting that the protected activity need only "oppose[] a hostile work environment that, although not fully formed, is in progress"). Not all employee complaints are protected by Title VII's retaliation provision, and the "[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races." *See Hawkins*, 203 F.3d at 282.

---

[10] The district court granted summary judgment to Bridgestone after holding that McIver's transfer to KBN2 was not an adverse employment action, there was no causal connection between McIver's 2013 complaint and her transfer, and Bridgestone had legitimate, nondiscriminatory reasons for transferring McIver—her inability to work with a partner and her behavior at the Phase I coaching meeting—which McIver had not shown to be pretextual. But when "reviewing the grant of summary judgment, we can affirm on any legal ground supported by the record and are not limited to the grounds relied on by the district court." *Jackson v. Kimel*, 992 F.2d 1318, 1322 (4th Cir. 1993). On appeal Bridgestone argues that McIver lacked a reasonable belief that her opposition activity related to a Title VII violation and failed to establish the necessary causal link between her protected activity and her transfer, so we review and affirm on that alternate ground.

20

McIver alleges that Bridgestone unlawfully retaliated against her by moving her to KBN2 in response to her 2018 tampering accusations, but her lack of a reasonable belief that her tampering allegations related to a Title VII violation and her failure to put Bridgestone on notice that she believed the tampering was on account of her race causes this claim to fail. And as we concluded above, McIver fails to put forward sufficient evidence that any tampering in 2018 was based on her race, and she does not allege here, nor did she believe at the time, that anyone tampered with her machine because of her race.

It had also been at least five years since any of the racial harassment at Bridgestone's plant. The horrible past events that we discussed above were too long ago and too intermittent to support a hostile-workplace claim, and for the same reasons, they cannot give rise to a jury question about whether the alleged tampering—done years later, by unknown parties—was connected to race. Given the lack of evidence that the tampering in 2018 was related to race, a jury would have no basis to infer that McIver had a reasonable belief that her complaints related to an ongoing Title VII violation. *See Boyer-Liberto*, 786 F.3d at 282.

Further, McIver never told Bridgestone that she attributed her 2018 tampering allegations to racial animus. "[W]e have consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021). Knowledge of a protected activity means not only knowledge that the activity occurred, *id.*, but also knowledge that the employee engaged in the protected activity *because* the employee had a reasonable belief that a Title VII violation occurred. An employee's belief that a Title VII violation has

21

occurred may be completely reasonable, but if she fails to tie complaints about workplace conduct to her protected status, the employer could not have retaliated for engaging in a protected activity. Without notice that an employee is complaining about discrimination based on their protected status, an employer has no means to distinguish between protected conduct and frivolous complaints about workplace disagreements unprotected by the law. *Cf. Hawkins*, 203 F.3d at 280 ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.").

When McIver complained about tampering in 2018 she did not tell Bridgestone, or conduct herself in a way that would have given Bridgestone notice, that her complaints were based on perceived racial harassment. And she did not even allege that Hawley or Wheeler—the only two people in MTS who she had alleged to management were racist— were the ones tampering with her machine.[11] Without that knowledge, Bridgestone had no duty to avoid reassigning McIver to KBN2 based on her facially neutral allegations which Bridgestone perceived to disrupt the MTS working environment and cause friction among teammates. With no complaint tied to racial discrimination, Bridgestone's resolution of this interoffice dispute was exactly the kind of decision that employers must make every

---

[11] McIver claims that she told Andy Moler, Bridgestone's Human Resources Manager, about Hawley hanging the noose in 2006 because "he wanted [her] to go back to where all this got started." J.A. 227. But McIver did not accuse Hawley of tampering with her machine, and Bridgestone perceived that her 2018 complaints were accusing Skelton, if anyone. McIver's comments to Moler about Hawley therefore provided no basis for Bridgestone to infer that McIver was making a racial harassment complaint against a different employee who she never, and still does not, accuse of racial animus.

day, and the law does not require employers to look behind every complaint to determine the employee's motive.

*        *        *

The overtly racist behavior that occurred at Bridgestone's plant was horrible, even shocking, but it occurred long ago, and it was not directed at McIver.  Such vestiges of racist conduct in the workplace do not transform every workplace disagreement into a cognizable Title VII claim for all time.  Because McIver fails to put forward evidence that any tampering to her MTS machine was based on her race, there is no genuine dispute of material fact here, and the district court's judgment is therefore

*AFFIRMED.*

23

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the judgment:

This appeal arises not from a motion to dismiss but from a motion for summary judgment. To defeat a grant of summary judgment, a plaintiff must produce sufficient evidence to demonstrate a genuine issue of material fact. I believe that Laverne McIver did so with respect to her contention that her machine had been tampered with. But she failed to offer evidence that racial discrimination motivated the tampering.

I write separately to emphasize the challenges faced by African American workers, like McIver, who work in a predominantly white environment. Now more than a half century after Congress enacted Title VII, far too many American workplaces remain stained by racism. The plant in which McIver worked was home to the most blatant displays of racism imaginable: hanging monkey effigies, nooses, an image of the Confederate flag, and racist caricatures of President Obama and Trayvon Martin. Of course, such abhorrent conduct does not occur in most workplaces; nor is there evidence that similar conduct has occurred at this plant in approximately a decade. But the removal of explicitly racist imagery does not eliminate racism in the workplace.

Especially in predominantly white workplaces, African Americans regularly experience forms of racism that are less explicit but no less insidious. For instance, when an African American woman asserts herself, she is often tagged by her supervisors and coworkers as an "angry Black woman," a harmful and well-rooted racial stereotype. *See Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 561 (E.D. Pa. 2021). McIver vigorously asserted that her machine had been tampered with and expressed frustration that Bridgestone had not done enough to investigate her claims. Bridgestone justified its

transfer of her on the basis that in doing so, McIver was "very intense" and "loud." I question whether an employer would have similarly labeled a white employee as "very intense" or "loud" under such circumstances.

When an African American person works in a predominantly white environment that has repeatedly allowed abhorrent, explicitly racist incidents to occur unpunished, the employee could well conclude that frequent machine tampering was based on race. But McIver failed to offer evidence that the tampering here was motivated by her race. Accordingly, I concur in the judgment.